Gloria **CATALANO** et al., Petitioners,

v.

**BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES** et al., Respondents.

**No. 72 Civ. 3180.**

United States District Court,
S. D. New York,
Civil Division.

Sept. 11, 1972.

McSherry & Coleman, Huntington, N. Y., for petitioners.

Reilly, Fleming & Reilly, New York City, for BRAC.

Arthur M. Wisehart, New York City, for REA.

## MEMORANDUM DECISION

GAGLIARDI, District Judge.

On July 26, 1972, petitioners Gloria Catalano, Elena A. Marino and Frank E. Masterson instituted proceedings on behalf of themselves and all others similarly situated to impeach an arbitration award dated February 4, 1972. On August 25, 1972, respondent BRAC filed a cross-claim against respondent REA seeking to permanently enjoin the proposed consolidation of REA facilities in New York with facilities in Chattanooga and Chicago.

The matter comes before the court on a total of eight motions.[1] For the purposes of this decision we concern outselves with two of these motions: 1) respondent BRAC's motion in which REA joins to dismiss the petition and 2) respondent BRAC's motion for a preliminary injunction pending a final determination of its cross-claim.

I. The Motion to Dismiss the Petition.

Respondent BRAC moves to dismiss the petition as barred by the statute of limitations. Several other grounds for dismissing the petition are put forth; however, having decided that the petition is barred by the statute of limitations, we do not reach these other grounds.

Section 9 of the Railway Labor Act sets forth the time limits for instituting an action to impeach an arbitration award.

The statute provides that:

An award . . . shall be conclusive . . . unless, within ten days after the filing of the award, a petition to impeach the award [is] filed . . . . 45 U.S.C. § 159(2) (1970).

The award under attack was filed with the Court on February 7, 1972; the petition before the Court was filed on July 26, 1972. Respondent BRAC contends that the time within which to file a petition to impeach the award expired on February 17, 1972; and that, therefore, the instant petition is time barred.

■ Petitioners admit the applicability of the ten-day limitation but argue that because the petition to impeach is based upon fraud, the action did not accrue until the fraud was actually discov-

ered on July 17, 1972 and that, therefore, the petition is timely. Petitioners base their argument upon general equity principles governing the accrual of actions in fraud actions. See Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946). However, in the instant case, these general principles must be subordinated to the congressional intent expressed in the language of the statutes governing arbitration procedures. It is evident that in enacting these provisions the Congress sought to ensure the speedy and conclusive settlement of disputes submitted to arbitration. Brotherhood of Railway and Steamship Clerks v. Norfolk Southern Ry., 143 F.2d 1015 (4th Cir. 1944). Thus Section 8 of the Act requires that the agreement to arbitrate specify the time within which hearings must be commenced and the time within which the award must be filed. In the light of the underlying congressional concern with speed and finality and of the clear language of the specific section, we must reject petitioners' argument and hold that the ten-day period is absolute and runs from the date of filing.

■ Moreover, assuming arguendo, that the petitioners are correct in their contention that the statute is tolled where the petition alleges fraud, petitioners are incorrect in their interpretation of when an action accrues in fraud cases. Actual discovery of an alleged fraud is not the sole test for the determination of accrual. In general, statutes of limitations begin to run when the fraud was discovered *or should have been discovered with due diligence.*

■ In the instant case, the petition alleges that not only was the award tainted by the arbitrators' acts of fraud

---

1. Petitioners' motion to vacate the arbitration award; petitioners' motion to add and drop parties; petitioners' motion to dismiss the cross-claim; petitioners' motion for a protective order; respondent REA's motion to strike the petition; respondent BRAC's motion for a prelimi-

nary injunction; respondent BRAC's motion to dismiss the petition or for summary judgment; respondent BRAC's motion to dismiss the petition or for summary judgment; respondent BRAC's motion to dismiss them as parties.

and collusion but, in addition, that the BRAC official who signed the agreement to arbitrate lacked authority to do so and that the arbitrators exceeded the terms of the agreement. These alleged defects in the award were readily discoverable on the day it was filed in February of 1972. Presumably alerted to the possibility of irregularity, the petitioners allowed five months to pass before investigating the question of fraud. Such a delay can hardly be argued to fulfill the equitable requirement of due diligence.

In accordance with the reasons stated, respondents' motion to dismiss the petition is granted.

## II. The Motion for a Preliminary Injunction.

BRAC has moved for a preliminary injunction pending a determination of its cross-claim against REA. BRAC asserts that the proposed consolidation and transfer of REA's New York facilities to Chattanooga and Chicago violates two pre-existing labor-management agreements. The first, a 1965 agreement, provides that consolidation and transfer shall not be effected without the consent of BRAC's General Chairman. The second, the "New York Stabilization Agreement", reached in 1966, permits seniority roster consolidation with only normal attrition of New York employees. BRAC contends that REA is still bound by these agreements, the arbitration award having done nothing to impinge their validity. REA, however, asserts the right to take its consolidation action pursuant to the arbitration award, which, it claims, specifically superseded the prior agreements.

■■ The classic criteria for granting a preliminary injunction are: (1) the probability of success, (2) irreparable harm, and (3) a balance of hardship. Robert W. Stark, Jr., Inc. v. New York Stock Exchange, 466 F.2d 743 (2d Cir. 1972); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir. 1969); Clairol, Inc. v. Gillette Co., 389 F.2d 264 (2d Cir. 1968); Studebaker Corp. v. Gittlin, 360 F.2d 692 (2d Cir. 1966). This extraordinary relief is granted only upon a clear showing that the equities lie substantially in favor of the moving party on each ground. After hearing extensive oral argument of counsel and the testimony of witnesses, we hold that injury and hardship are equally onerous on both sides and accordingly, deny BRAC's motion for a preliminary injunction.

■ The hardship imposed upon the New York area employees affected by REA's move of certain operations to the west is clear. One hundred members will see their jobs abolished; sixty-five more may elect to follow their jobs to Tennessee or Illinois. Not surprisingly, only a few have elected the second alternative because of the difficulties, doubts and suffering of such a move. Under the terms of the arbitration award, those employees who do not follow their work will receive for a period of 3 years weekly unemployment benefits equivalent to approximately $10.00 less than their current take-home pay. Should an employee, however, accept work elsewhere, benefits would cease.

Injury to REA if we grant the injunction would be equally grave. REA's financial position is precarious. The transfer and consolidation of its facilities in the west is the first part of a plan to insure financial stability by reducing overhead costs and increasing employee efficiency. REA has given notice to cancel its lease of its present offices on 38th Street. The notice had to be given by August 31, 1972; failure to do so would obligate REA to continue to lease until 1978. By cancelling the lease, REA has saved over $1,000,000. In anticipation of its move, REA has also taken other serious steps: the execution of a long-term lease in Chattanooga, shipments of documents, equipment and furniture to Chattanooga and Chicago, positions awarded, supervisory personnel transferred, instructions to customers to use Chattanooga and Chicago offices, and

short supplies on hand in New York offices.

It is obvious, therefore, that grave consequences inure to both sides should we issue a preliminary injunction. The very real human suffering of 165 members of BRAC parallels the serious and sometimes irreversible financial and other arrangements taken by REA. By waiting until the eleventh hour [2], BRAC has undermined its argument that the balance of equities tips in its favor.

Lastly, and very briefly, BRAC has failed to make a substantial showing of probable success upon the merits of its cross-claims. The assertion that the 1965 and 1966 agreements have survived the arbitration award and are still binding flies in the face of question 3(b) propounded to the arbitration board and the answer received. BRAC is bound by the mandatory provisions of the arbitration agreement to refer back to the same arbitration board any differences arising as to meaning or application of the award. Railway Labor Act, § 8(m), 45 U.S.C. § 158(m) (1970). Also, Section 8 of the Norris-La Guardia Act, 29 U.S. C. § 108 (1970) imposes the duty upon a party "to make every reasonable effort to settle such dispute . . . with the aid of . . . voluntary arbitration." Failure to do so would preclude injunctive relief. Brotherhood of Railroad Trainmen v. Toledo, Peoria and Western R. R., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944).

In summary, the petition is dismissed and BRAC's motion for a preliminary injunction is denied. September 19, 1972 is scheduled for a final hearing of the merits of the cross-claim.

So ordered.

2. BRAC received formal notice of REA's intention to transfer and consolidate New York facilities in March, 1972. Thereafter, REA agreed to postpone the action pending discussions with BRAC. Discussions failed to produce any substantial agreement and REA served its final notice to effect its proposed change on August 1, 1972.